No. 18,618.

THE HUNDLEY DRY GOODS COMPANY, *Appellant*, v. W. H. LINVILLE, *Appellee*.

SYLLABUS BY THE COURT.

PROMISSORY NOTE—*Evidence Insufficient to Show Fraud.* There was no sufficient evidence of fraud in the procuring of the promissory note sued on to justify the submission to the jury of the question of fraud as determinative of the validity of the note.

Appeal from Mitchell district court; RICHARD M. PICKLER, judge.  Opinion filed January 9, 1915.  Reversed.

*C. L. Kagey,* and *R. M. Anderson,* both of Beloit, for the appellant.

*Edgar Bennett,* and *Charles W. Clarke,* both of Washington, for the appellee.

The opinion of the court was delivered by

SMITH, J.: The appellant, the Hundley Dry Goods Company, sold a bill of goods to the Linville Dry Goods Company amounting to over eight hundred dollars.  Before any payments were made on the bill the Linville Dry Goods Company sold its entire stock of dry goods to one J. H. Huyck, who assumed and agreed to pay the wholesale bills outstanding, including the bill of appellant.  Huyck paid nothing thereon, but sold the stock of goods to one C. W. Jolley, who in turn assumed and agreed to pay all the wholesale bills, including the bill of appellant, but neither did Jolley pay anything thereon.

Sometime thereafter Mr. Babb, a representative of the Hundley Dry Goods Company, came to W. H. Linville, who had been president of the Linville Dry Goods Company, when, as appears by the testimony of Linville in the transcript, the following colloquy occurred between Linville and Babb:

"A.  He (Babb) said his people sent him out to straighten up the accounts of the Linville Dry Goods Company.  He wished to get that in some kind of shape different from what it was and I told him that Mr. Jolley was assuming that portion, and he said Jolley was not able to assume that and he did n't want to settle that matter without my signature or guarantee.

"Q.  What did Babb want to do?  A.  He wanted me to sign a note.

"Q.  What did he say?  A.  He said if I would sign it, Mr. Jolley would then sign; that it would be returned to me and never be turned in to the company.

"Q.  What did he say would be done with the note if

Mr. Jolley would sign it? A. I don't know, I can not repeat the words he used right along, but however if Mr. Jolley signed the note he had money enough at the Farmers State Bank of Washington to cover this and hold the note in the bank, to be turned over to the bank and not be applied on the accounts.

"Q. After these remarks by Mr. Babb, what did you do? A. I finally signed the note.

"Q. For how much? A. Whatever the note called for, eight hundred and some dollars.

"Q. What was done with this note after you signed it? A. About the next thing I heard—

"Q. (Interrupting.) Did you deliver this note to Mr. Babb. A. Yes, sir.

"Q. After signing and delivering this note to Mr. Babb, did you have any further conversation with him that day? A. Yes, sir.

"Q. What was that? A. Well, before I left town, Mr. Babb came to me—I was at the depot—and he said Mr. Jolley had refused to sign the note, and then we went back up town.

"Q. Babb told you that Jolley had refused to sign the note? A. Yes, sir.

"Q. What was then done? A. We came down to Mr. Bennett's office in Washington and Mr. Jolley finally signed another note for the same amount.

"Q. Payable to the Hundley Dry Goods Company? A. Yes, sir.

"Q. What was done with that note? A. Mr. Babb put it in his pocket.

"Q. Was this note signed by you returned to you? A. No, sir.

"Q. It was to have been? A. Yes, sir; according to our former agreement.

"Q. But was it afterwards returned? A. No, never was.

"Q. This man Babb, who was he? A. He was attorney or agent for the Hundley Dry Goods Company.

"Q. Where was this note drawn and signed by you? A. In Mr. Bennett's office at Washington, Kan.

"Q. Any one present besides you and Mr. Babb? A. Mr. Bennett.

"Q. Was that all? A. That was all."

The court instructed the jury, in substance, that Linville was not personally responsible for the entire indebtedness of the Linville Dry Goods Company until

he signed the note in question; that he was not responsible on the note if the same was procured by false representations made by the plaintiff's agent with the intent to cheat and defraud the defendant in the giving of the note and plaintiff's agent knew them to be false when made, and the defendant believed them to be true and relied thereon and was induced thereby to execute and deliver the note sued on when otherwise he would not have done so.

The note sued on was an unconditional promise to pay the amount specified therein at a certain time, and we can not agree that there was any sufficient evidence that Linville's signature was procured through fraud. Mr. Linville testified, as above set forth, that Mr. Babb said "Jolley was not able to assume that (the debt of the Linville Dry Goods Company), and he (the solicitor) did n't want to settle the matter without my signature or guaranty. . . . He said if I would sign it, Mr. Jolley would then sign; that it would be returned to me and never be turned in to the company. . . . If Mr. Jolley signed the note he had money enough at the Farmers State Bank of Washington to cover this and hold the note in the bank, to be turned over to the bank and not be applied on the accounts."

It is hard to conceive how an intelligent man, and Linville was evidently a business man, could believe such representations or be deceived thereby.

It further appears that Jolley, the second purchaser of the stock of goods, did sign a note for about the same amount, but it does not appear that Linville demanded the return of his note, which he says was a part of the agreement upon which he signed it. He says he was present when Jolley signed the note, and it appears that he allowed the solicitor to go away with both notes without objection. In fact, he was in about the same condition that he would have been had he and Jolley signed the same note and the solicitor had, in substance, informed him that he would not accept Jolley's note alone.

We conclude that the evidence does not support the verdict of the jury which under the instructions must be based upon a finding of fraud in the procuring of the note. It can not be said that the note was given without any consideration, although the consideration did not pass to Linville personally but to the corporation of which he was president and a stockholder. In effect, the note was given by him as a surety for his corporation.

The motion for a new trial should have been sustained. The judgment is reversed and the case is remanded for a new trial.

BURCH, J. (dissenting) : I.dissent. The evidence was sufficient to show that the delivery was for a special purpose. (Negotiable instruments act, § 23, Gen. Stat. 1909, § 5269, and cases cited in *Storey v. Storey*, 214 Fed. 973.) The use of paper delivered for a special purpose only and not for the creation of a debt for other purposes constitutes fraud.

SMITH, J., joins in the dissent of Mr. Justice BURCH.